Edward Cerasia II (EC-8297)
Adam S. Wexler (AW-6140)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
212.309.6000

Attorneys for the Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
STEVEN ROBERTS                              :
                                            :
                    Plaintiff,              :
                                            :
         -against-                          :
                                            :    06-CV-05966 (GEL)
AIG GLOBAL INVESTMENT CORP.,                :
AMERICAN INTERNATIONAL GROUP,               :
INC., AND JUDY LOMBARDO                     :
                                            :
                    Defendants.             :
-----------------------------------------------------------x

## DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Civil Rule 56.1 of the Court, defendants AIG Global Investment Corp. ("AIGGIC"), American International Group, Inc. ("AIG"), and Judy Lombardo ("Lombardo") (collectively, the "Defendants") respectfully submit this statement of undisputed material facts in support of their motion for summary judgment:

### Roberts' Employment with AIG

1.   AIG hired plaintiff Steven Roberts ("Roberts") on August 5, 2002, as an Assistant Director in its Treasury Financial Analysis Group. (Deposition of Steven Roberts ("Roberts Dep.") at 60.) Roberts held that position through December 2003. (Id.)

2.   Robert Gender ("Gender") was Roberts' direct supervisor throughout his tenure in the Treasury Financial Analysis Group. (Deposition of Robert Gender ("Gender Dep.") at 23,

25.) Gender treated Roberts fairly, and Roberts does not accuse Gender of discriminating against him in this case. (Roberts Dep. at 104-5.)

3. As the Assistant Director in AIG's Treasury Financial Analysis Group, Roberts was responsible for analyzing the risks associated with various short-term investments (such as short-term securities, commercial paper and certificates of deposit) and performing analytical work with regard to asset-backed investment opportunities. (Gender Dep. at 21-22; Roberts Dep. at 109-15.)

4. Roberts supervised between two and three full-time credit analysts and up to six part-time credit analysts at AIG. (Gender Dep. at 21-22.; Roberts Dep. at 60-61.) As a supervisor, Roberts reviewed reports generated by the credit analysts for accuracy. (Gender Dep. at 21-22).

5. AIG's traders relied upon the reports prepared by Roberts' work group in making investment decisions. (Roberts Dep. at 113-14.)

6. As a general rule, Roberts was expected to arrive to work by 9:00 a.m while employed by AIG. (Gender Dep. at 39; Roberts Dep. at 69, 89-90.)

7. The vast majority of transactions that the trading group entered into took place between 9:30 a.m. and 4:00 p.m. on Monday through Friday. (Roberts Dep. at 132.)

8. Roberts expected the people he supervised to arrive at work at "approximately 9:00 [a.m.], unless they conveyed to [him] there was a problem or unless they conveyed to [him] there was an issue." (Roberts Dep. at 64.)

9. Approximately one year after commencing his employment with AIG, on June 1, 2003, Gender prepared a Performance Appraisal (the "Appraisal") for Roberts. (Gender Dep. at 24; Roberts Dep. at 517; Roberts Dep. Ex. 21.)

10. In the Appraisal, Gender stated that Roberts' "management style can be improved to develop better communication with his staff to build a more team like environment." (Roberts Dep. Ex. 21.) Roberts' failure to effectively manage his subordinates led to delays in the credit analyst report process for which Roberts was responsible. (Gender Dep. at 22.)

11. Gender also stated in the Appraisal that, although Roberts' management role required him to be "accessible to both his staff and management," he "has had punctuality problems." (Roberts Dep. Ex. 21.)

12. Gender rated Roberts as a "4" – on a scale from 1 (highest) to 5 (lowest) – in the category of "Dependability." (Roberts Dep. Ex. 21.) Gender based that rating on Roberts' punctuality and attendance problems, as well as the backlog of work for which he was responsible. (Gender Dep. at 28-29.)

13. In addition to normal attendance, Roberts' position also required communication with the credit analysts that he supervised to provide them with guidance and training. (Roberts Dep. at 61-62; Gender Dep. at 33.) Roberts, however, often failed to report to work – either on time or at all – and did so without providing advance notice to Gender. (Roberts Dep. Exs. 6 & 7; Declaration of Edward Cerasia II, Esq. ("Cerasia Decl.") at ¶¶ 11-12.) For instance, on at least one occasion, Roberts did not arrive at work until 2:30 p.m., without giving anyone advance notice of his late arrival. (Roberts Dep. at 120-21; Roberts Dep. Ex. 5.)

14. Even Roberts' colleagues at AIG expressed to him their dissatisfaction with his punctuality and attendance. (Roberts Dep. at 153.)

15. Roberts never told Gender or any managers at AIG that he had a sleep disorder or depression, or that he sought counseling from a therapist, psychologist, or psychiatrist. (Roberts Dep. at 80-82, 142-45; Gender Dep. at 35.)

3

### Roberts' Employment with AIGGIC

16. AIGGIC is a corporation organized under the laws of New Jersey, with a principal place of business in New York, New York. (Compl. ¶ 6; Answer, ¶ 6.)

17. In late-2003, AIG's senior management decided to merge the AIG Treasury Department into the Investment High Grade Research Department because there was "a lot of duplication" in what the two groups did. (Deposition of Mark Gross ("Gross Dep.") at 13-14; Gender Dep. at 11-12.)

18. Effective January 1, 2004, Roberts and one other AIG employee, John Brandon, were transferred to the Investment High Grade Research Department at AIGGIC. (Roberts Dep. at 60.) Mark Gross ("Gross"), who was the Director of Investment High Grade Research, became Roberts' supervisor at that time. (Gross Dep. at 7-8, 22.)

19. At AIGGIC, Roberts was responsible for coordinating the workflow of up to 15 analysts in order to approve and finalize analyses with respect to short-term investments. (Roberts Dep. at 423, Gross Dep. at 22-23, 63-64.) This process was necessary because traders could not purchase short-term investments without obtaining the approval to do so. (Roberts Dep. at 435.)

20. Roberts also was responsible for ensuring that the reports prepared by his new working group at AIGGIC with respect to short-term investments complied with the disclosure requirements set by the Securities and Exchange Commission ("SEC"). (Roberts Dep. at 424; Deposition of Donald McHugh ("McHugh Dep.") at 25-27.) As part of that responsibility, Roberts was instructed to develop a new format for the AIGGIC analysts to use in preparing reports for short-term investment products that the work group was recommending. (Gross Dep. at 44.) Roberts was never able to generate this new report format. (Id.)

21. Roberts was the only AIGGIC analyst who was responsible for working with the asset-backed commercial paper ("ABCP") group to identify potential new ABCP investments for traders. (Roberts Dep. at 321, 429-30.) Specifically, Roberts was responsible for devising a system to monitor ABCP holdings in concert with the asset backed securities group. (Id. at 429-30.) Roberts also was responsible for providing the asset backed investment group with written analyses of potential ABCP investments. (Id. at 431-35).

22. Roberts knew that the purpose of the reports was to make recommendations concerning the purchase of specific ABCP investments, based on a creditworthiness analysis. (Id.) Roberts' recommendation was required before a decision could be made to invest in a specific ABCP investment. (Id.)

23. Because the asset backed group relied on the reports that Roberts generated to make investment decisions about ABCP products, those reports were time sensitive. (Gross Dep. at 100-01; Roberts Dep. at 431-35.) When Roberts failed to deliver timely written analyses, he delayed the approval process necessary for investing in specific ABCP investments. (Roberts Dep. at 431-35.)

24. Roberts was the only employee in AIGGIC who performed the combination of functions for which he was responsible. (Roberts Dep. at 319-20.)

25. At AIGGIC, all employees in the Investment High Grand Research Group were expected to report to work by 8 a.m. (Gross Dep. at 59.)

26. Roberts and his colleagues in the High Grade Research Group were expected to attend twice-weekly meetings on Tuesday and Thursday of each week, along with employees in the portfolio management group and the trading group. (Gross Dep. at 60, 63.) The purpose of these meetings was to maintain open lines of communications between the three work groups,

5

which AIGGIC marketed to customers as its "three-legged stool." (Roberts Dep. at 477-79.) The meetings, and the communication they fostered, were important to the business of Roberts' work group. (Id. at 479.)

27. Throughout Roberts' employment at AIGGIC, Gross was concerned that Roberts was unable to work with the analysts to help them develop the new report format for which Roberts was responsible. (Gross Dep. at 44-45.) Analysts had complained that Roberts provided them with vague instructions, that they did not know how to comply with his demands, and that, although he expressed dislike with their work, he failed to provide them with any constructive criticism. (Id.)

28. In his interaction with Roberts, Gross also experienced communication problems similar to those that the analysts had brought to his attention. (Gross Dep. at 46.) Roberts communicated with Gross in a vague manner, and was extremely slow to complete assignments. (Id.) Moreover, the work that Roberts did complete was unwieldy, difficult to understand, and did not make "logical sense." (Id.)

29. By "the end of February" 2004 – approximately two months after Roberts was transferred to AIGGIC – "it became pretty clear" to Gross that Roberts had performance problems, and thus he spoke with AIGGIC senior management, Rich Mercante ("Mercante") and Don McHugh ("McHugh"), and with Lisa Landstein and Sarah Perez ("Perez") in the Human Resources Department about terminating Roberts' employment. (Gross Dep. at 41, 42, 47, 48, 94, 122; Deposition of Sarah Perez ("Perez Dep.") at 37-38.)

30. As of March 2004, Gross "would have" fired Roberts "if [he] could have fired him then." (Gross Dep. at 42, 47, 48, 94, 122, 155.) There were two reasons for wanting to terminate Roberts' employment: Roberts' "inability to get along with other people" – he "was

6

disruptive to a number of employees" and "[h]e irritated quite a few people" – as well as his failure to perform his job functions – "he just wasn't getting the job done." (Id. at 42, 44-45.)

31. At a March 2004 meeting with Perez, Gross told Perez that he wanted to terminate Roberts' employment because of Roberts' performance problems and failure to assimilate into his new working group. (Perez Dep. at 39-40.) Gross told Perez that Roberts had failed to comply with Gross' request that he move his office from its former location to be with the other members of Roberts' new working group who were located in a different building; failed to attend team phone calls, some of which Roberts was supposed to lead; had been abrasive or non-responsive in his interactions with co-workers, and failed to meet deliverable requirements. (Id. at 40-42.)

32. Perez advised Gross that he could not terminate Roberts' employment at that time, and that Gross had to provide Roberts with the proper feedback, coaching, or a plan of action to improve on Roberts' performance deficiencies. (Perez Dep. at 44.) Perez advised Gross to maintain a log of Roberts' performance to assist him in communicating with Roberts about areas in which Roberts needed to improve. (Id. at 46; Gross Dep. Ex. B) Gross intended to carry out his decision to terminate Roberts' employment if Roberts did not show improvement in his performance. (Gross Dep. at 48.)

33. Thereafter, on March 25, 2004, Gross met with Roberts for approximately two hours to address his ongoing concerns about Roberts' job performance, including Roberts' interactions with others, work responsibilities, failure to move his office from its former location, and his unsanitary office conditions. (Roberts Dep. at 219; Gross Dep. Ex. B.) Gross explained to Roberts that the High Grade Research Group was based in large part on teamwork and collegiality, and that Roberts needed to interact well with colleagues in order to become an

7

integral part of the group. (Roberts Dep. at 224.) Roberts responded to Gross' concerns with a number of other excuses, including that he had trouble dealing with other analysts and did not like the information he was getting from rating agencies. (Gross Dep. at 52-53.)

34.     When Gross asked why Roberts had failed to move his office, Roberts told Gross that he had "health problems" that affected his attendance and preferred to work at his existing location so that others would not know of these problems. (Gross Dep. Ex. B.) At no time during that meeting or at any time thereafter did Roberts ever tell Gross anything about his specific medical problems. (Gross Dep. at 50-51; Roberts Dep. at 142-45.)

35.     Gross and McHugh met with Roberts several times to discuss Roberts' goals for 2004. (Roberts Dep. at 237-38; Gross Dep. Ex. B.) On April 30, 2004 Mr. Gross sent Roberts an e-mail containing his goals for 2004, as they had discussed at meetings. (Roberts Dep. at 237; Gross Dep. Ex. B.) The goals identified specific job responsibilities on which Roberts should focus, and also noted that he had to "improve rapport with other analysts" and "improve rapport with other groups." (Gross Dep. at 134-35; Gross Dep. Ex. B.)

36.     Gross focused on Roberts' failure to integrate with other analysts because it was important for Roberts to get along with his co-workers in order to fulfill his performance goals. (Gross Dep. at 134-35.) During this time period, colleagues continued to complain about working with Roberts because he mistreated them and was a poor communicator. (Id. at 134-36.) Roberts' job required him to "interact with the rest of the group" and work as a team. (Id. at 64.)

37.     During this same time period, Perez also received negative feedback concerning Roberts' performance from other employees who interacted with him, including Mercante, Matt Meyer, John Brandon, and George Coleach ("Coleach"). (Perez Dep. at 60-62.)

8

38. Roberts was aware that many of his colleagues in the High Grade Research Group, traders and portfolio managers had complained about his interaction with and treatment of them, including Jack Carroll, Donna Rosario, Coleach and Mike Rieger. (Roberts Dep. at 215-17.)

39. Roberts' attendance problems continued throughout his employment with AIGGIC. (Roberts Dep. at 255-57; Gross Dep. Ex. B.) There were times when Roberts was up to three to four hours late reporting for work, without having first provided notice to anyone at AIGGIC. (Roberts Dep. at 255-57; Gross Dep. Ex. B.) There also were times when Roberts would fail to show for work at all, without first providing notice to anyone at AIGGIC. (Roberts Dep. at 255-57; Gross Dep. Ex. B.)

40. Roberts' performance problems persisted in the Spring and Summer of 2004. For example, on June 18, 2004, Mike Reiger ("Reiger"), the individual responsible for ABCP, asked Roberts to provide him with detailed analyses of certain ABCP investment opportunities over the course of three business days. (Roberts Dep. at 438-39; Roberts Dep. Ex. 14.) While Roberts indicated that he would do so, thirteen days later he still had not provided Rieger with a single analysis. (Roberts Dep. at 462-64; Roberts Dep. Ex. 17.)

41. Roberts admits that Reiger did not discriminate against him based on his alleged disabilities. (Roberts Dep. at 218-19.)

42. By July 2004, Gross wanted to terminate Roberts' employment and consulted with Perez, who advised Gross that he could issue Roberts a final written warning at that point. (Gross Dep. at 88, 122; see also id. at 155 (Gross wanted to fire Roberts as of June 11, 2004).)

43. On July 22, 2004, Gross and Perez met with Roberts to discuss Roberts' ongoing performance problems and to deliver a final written warning to him. (Roberts Dep. at 212-13;

Perez Dep. at 69-71; Gross Dep. at 73; Roberts Dep. Ex. 9.) During that meeting, Gross discussed Roberts' continuing performance problems, including Roberts' interaction with others, his work product and responsibilities, and attendance issues. (Roberts Dep. at 214-15; Roberts Dep. Ex. 9.)

44. Roberts was issued the final written warning because "these issues – primarily attendance, dependability, ability to work well with others, and ability to perform the required tasks – ha[d] been brought to [Roberts'] attention on a number of occasions," but "it is clear that [Roberts was] still not meeting his objectives." (Roberts Dep. Ex. 9.)

45. Under the terms of the final written warning, Roberts had 10 business days to show "dramatic and consistent improvement in [his] performance," or else his employment would be terminated:

> Steps have to be taken to immediately correct the above performance issues and will be reviewed in 10 days from this meeting. We expect to see dramatic and consistent improvement in your performance or additional disciplinary action will be initiated up to and including termination of employment.

(Roberts Dep. Ex. 9; Roberts Dep. at 265; Gross Dep. at 89; Perez Dep. at 73.)

46. When Gross gave Roberts the final written warning on July 22, 2004, he thought that it was "highly likely" that he would terminate Roberts' employment in ten days, because he "did not expect [Roberts] to improve dramatically within ten days." (Gross Dep. at 89, 122-23.)

47. When Roberts mentioned that he might see a doctor, Perez left the room to get a "Request for Leave of Absence" form and a "Notice and Proof of Claim for Disability Benefits" form for Roberts, and handed them to Roberts. (Perez Dep. at 79, 104.)

48. On August 2, 2004, Roberts met with Jane Dillon ("Dillon"), Senior Benefits Manager for Health Care Reviewers at AIG, and submitted a Notice and Proof of Claim for

Disability Benefits form (the "Notice") to her on that date. (Roberts Dep. at 191, 292-93; Deposition of Jane Dillon ("Dillon Dep.") at 69-70; Roberts Dep. Ex. 8; Cerasia Decl. at ¶ 13.)

49. Prior to meeting with Roberts on August 2, 2004, Dillon had no knowledge of Roberts' alleged medical conditions or disabilities. (Declaration of Jane Dillon ("Dillon Decl.) at ¶ 6).

50. Roberts completed the first page of the Notice. (Roberts Dep. at 337; Roberts Dep. Ex. 8.) On the first page of the Notice, it states that Roberts would "bec[o]me disabled on 8/12/04." (Roberts Dep. Ex. 8.) Roberts originally identified "8/11/04" as the date he became disabled, but changed the date to "8/12/04" before submitting the Notice to Dillon. (Roberts Dep. at 366; see Roberts Dep. Ex. 8.)

51. Roberts' treating psychiatrist, Dr. Susan Deakins, completed the second page of the Notice. (Roberts Dep. at 364; Roberts Dep. Ex. 8.) On the second page of the Notice, it states that Roberts would "bec[o]me disabled on 8/12/04." (Roberts Dep. Ex. 8.) Dr. Deakins originally identified "8/11/04" as the date Roberts would become disabled, but Roberts later changed that date to "8/12/04." (Roberts Dep. at 365-66.)

52. On August 3, 2004, Roberts submitted a Request for Leave of Absence form to an employee in the Human Resources Department at AIGGIC. (Perez Dep. at 98-100; Roberts Dep. Ex. 12.) The Request for Leave of Absence form, which was not signed by Roberts' supervisor or timekeeper, indicated an anticipated leave start date of August 12, 2004. (Perez Dep. at 98-100; Roberts Dep. Ex. 12.)

**AIGGIC Dismissed Roberts For Unsatisfactory Job Performance**

53. On August 3, 2004, Roberts failed to report to work. (Roberts Dep. at 345.)

54. On August 5, 2004, Roberts was late to work. (Roberts Dep. at 367.)

55.     As of August 5, 2004, Roberts had not shown any dramatic or consistent improvement in his work performance, as he was required to do under the final written warning. (Gross Dep. at 122-23; Gross Dep. Ex. G; Perez Dep. at 140.)

56.     After consulting with Human Resources and senior management at AIGGIC, Gross ultimately decided to terminate Roberts' employment for unsatisfactory performance, effective August 5, 2004. (Gross Dep. at 94, 125, 126, 127, 130; Perez Dep. at 119; 138; Gross Dep. Ex. H.) Gross got to a point where he felt that he "had no other action to take other than to terminate [Roberts]." (Gross Dep. at 94.)

57.     The Separation/Termination Form completed in connection with Roberts' termination identified "unsatisfactory performance" as the basis for that decision. (Perez Dep. Ex. S; Perez Dep. at 119.)

58.     At the time the decision was made to terminate Roberts' employment on August 5, 2004, Gross did not mention or discuss Roberts' August 2 request for a leave of absence with anyone, and it was not considered as part of the decision to terminate Roberts' employment. (Gross Dep. at 159.)

59.     After Roberts' employment was terminated, he was given the opportunity to return to his office to claim any personal items. (Roberts Dep. at 497, 513, 515).

**AIG'S STD Program**

60.     AIG's Short Term Disability ("STD") Program applicable to AIG and AIGGIC employees provides employees with paid leave for a maximum of 26 weeks and runs concurrently with any leave to which an employee may be eligible to take under the Family Medical Leave Act ("FMLA"). (Cerasia Decl. at ¶ 19; Dillon Decl. at ¶ 3.) AIGGIC does not pay employees for the time they are on leave under the FMLA. (Dillon Decl. at ¶ 3). Roberts

expected to be paid by AIGGIC during the period of time for which he would be on a medical leave of absence. (Roberts Dep. at 330.)

61.     The STD Program is a salary continuation program that is payable out of AIG's general operating assets and not out of any separate account, fund or trust; paid at the employee's normal rate of compensation; paid for periods of time allowed as absences from employment for certain medical reasons; is a traditional practice; and is paid without additional conditions or contingencies of any kind. (Dillon Decl. at ¶ 4).

62.     Judy Lombardo is not the administrator of the STD Program. Indeed, there is no administrator of the STD Program. (Dillon Decl. at ¶ 5).

**Roberts Did Not Disclose His Alleged Disabilities Or Request An Accommodation**

63.     Roberts never submitted any documentation to AIG or AIGGIC concerning a request for an accommodation to his work schedule. (Roberts Dep. at 498-99.)

64.     Roberts never filed a complaint with AIG or AIGGIC contending that he was denied an accommodation for any alleged disability, although he knew that he had the right to do so. (Roberts Dep. at 500-01.)

65.     Roberts never completed or submitted a written request for an intermittent or reduced leave of absence. (Roberts Dep. at 388.)

66.     Roberts never requested to work fewer hours or fewer days. (Roberts Dep. at 391.)

67.     Although Roberts knew he had to submit medical documentation to AIGGIC in support of any request for an accommodation, he allegedly submitted nothing more than a single letter from his doctor, which failed to identify any specific limitations on his ability to perform the functions of his job. (Roberts Dep. at 280-82; Roberts Dep. Ex. 8; Gross Dep. at 143-44

(Gross never saw this doctor's letter).) AIGGIC was entitled to medical documentation of Roberts' alleged disabilities prior to making a decision about whether to accommodate those alleged disabilities. (Roberts Dep. at 304-05).

68. As of August 5, 2004, Mr. Gross did not know that Roberts had a sleep disorder, depression, or any other mental health condition. (Roberts Dep. at 183, 187, 515-16.) Gross first learned about Roberts' alleged disabilities after this lawsuit was filed. (Gross Dep. at 55.)

69. Roberts never told Gross or any managers at AIGGIC that he had a sleep disorder, any problem with sleep, or any mental or depression-related issues. (Roberts Dep. at 142-45; Gross Dep. at 151-52 (Gross had no idea why Roberts could not do his job).)

70. As of August 5, 2004, no AIGGIC employees in Roberts' work unit knew that he had a sleep disorder, depression, or any other mental health condition. (Roberts Dep. at 183, 187-88.)

71. The only medical condition that Roberts discussed with Gross concerned his alleged back problem, for which Roberts received a special chair. (Roberts Dep. at 81-82, 161; Gross Dep. at 55.)

72. While Dillon, as AIG's Senior Benefits Manager in Health Care Review, had knowledge of Roberts' medical condition on August 2, she was not involved with any employment decisions concerning Roberts and never disclosed those conditions to any managers at AIGGIC. (Dillon Decl. at ¶ 7).

73. Roberts claims that he became unable to work because of his alleged sleep disorder and/or his depression as of August 12, 2004, and that he still was unable to work as of July 3, 2007. (Roberts Dep. at 361; see also Cerasia Decl. at ¶¶ 14, 15.)

## AIG and AIGGIC's Good-Faith Efforts To Comply With The Law

74. While employed by AIG and AIGGIC, Roberts received a copy of the Employee Handbook, which set forth the company's equal employment opportunity policy and outlined the avenues of complaint available to him if he believed that he was being discriminated against on the basis of a disability. (Roberts Dep. at 87-88; Roberts Dep. Exs. 4, 13.)

75. AIG trains its employees on compliance with the anti-discrimination laws, including Gross, who successfully completed an equal employment opportunity course in November 2003. (Gross Dep. at 144; Gross Dep. Ex. M.)

Dated: New York, New York
       November 9, 2007

                         Respectfully submitted,

                         MORGAN, LEWIS & BOCKIUS LLP

                         By s/Edward Cerasia II
                            Edward Cerasia II (EC-8297)
                            Adam S. Wexler (AW-6140)
                         101 Park Avenue
                         New York, New York 10178
                         212.309.6000

                         Attorneys for the Defendants